[Civ. No. 3929.  Third Appellate District.—June 30, 1930.]

F. D. GALEPPI, etc., Respondent, v. C. SWANSTON & SON (a Corporation), Appellant.

McLaughlin & McLaughlin for Appellant.

S. H. Jones and A. B. Reynolds for Respondent.

FINCH, P. J.—This is an action for the conversion of twenty-seven head of bovine cattle of the alleged value of $2,871.83. The defendant is engaged in "meat packing, slaughtering,—general meat packing business." The complaint is in the usual form. The answer, in addition to denials of allegations of the complaint, alleges:

"That said plaintiff on or about the 13th day of November, 1928, entered into a sale or agreement of sale of all the cattle mentioned in the complaint to one C. W. King, and pursuant to said agreement, delivered said cattle to C. W. King, who with the knowledge, acquiescence and consent of plaintiff, shipped said cattle on the Western Pacific Railroad, from Quincy Junction, Plumas County, California,

from C. W. King, as consignor, to C. W. King, as consignee, at Swanston, Sacramento County, California, and said plaintiff knew and understood at the time said cattle were by him delivered to said C. W. King, that C. W. King intended to ship said cattle on the Western Pacific Railroad, and to sell said cattle."

The court found that the allegations of the complaint are true and that "each and all of the allegations and denials of the defendant's answer and amended answer are untrue." Judgment was entered in favor of the plaintiff for the alleged value of the cattle and the defendant has appealed.

The plaintiff is engaged in farming and raising cattle in Plumas County. In September, 1928, he agreed to sell the cattle involved herein to Charles W. King, delivery to be made in November of that year. "The cattle were to go to Orvis & Clinger, at Stockton. . . . They were running a slaughter house in Stockton." King was given possession of the cattle at Quincy Junction on the 12th of November and at that time he gave the plaintiff a check for the purchase price thereof, drawn on the California National Bank at Sacramento. The cattle were inspected and shipped on the same day. The certificate of inspection recites and the plaintiff knew, "at the time these cattle were shipped from Quincy Junction, that they were shipped by Charles W. King of Stockton, to Charles W. King at Stockton." The plaintiff testified that King asked him for a bill of sale, but that he refused to give one without receipt of "the actual cash" in payment for the cattle and that he "was going to deliver" the bill of sale when he "heard that the check was honored." On November 15th the plaintiff was notified "that the check had been dishonored." It appears that King left for parts unknown on that day.

King diverted the shipment to Swanston Station, Sacramento County, and on November 13th he and his brother-in-law, W. C. Hansen, sold the cattle to the defendant. T. W. Lee, the defendant's buyer, acted for the defendant in the transaction. He testified that he had known King and Hansen "probably three months" and had only casual acquaintance with them; that they were in the business of buying livestock; that he made no inquiry "to ascertain whose brand was on the cattle" or where they had been purchased. He was further examined and testified as follows: "Q. Did you

ask them at that time to produce any bill of sale, or evidence of title to the cattle? A. I did, on the 15th, when I gave him (King) the . . . draft. He told me at that time he would bring the bill of sale out that afternoon, which he did, to the office. Q. Did he tell you he had a bill of sale? A. He said he would bring me out the bill of sale for those cattle I bought from him . . . that afternoon. Q. You gave him a draft, did you, before you got the bill of sale? A. I gave him the draft a little after 12 o'clock; he told me he would bring the bill of sale out that afternoon. Q. You are referring to a bill of sale from King and Hansen to you? A. Yes. Q. Now, do you know when Swanston & Son received the bill of sale from King and Hansen for these cattle? A. Some time after I issued the draft that afternoon.''

Roy Gee, the defendant's cashier and office man, testified: ''I was at the bank (California National Bank) about 12, between 12 and 12:30 (November 15), and Mr. May (assistant cashier) told me that King had some draft come in that hadn't been paid; I returned to the office and when I got out there I found in the meantime Mr. Lee had issued our draft. Q. Then you rushed right back to the bank to try to stop payment? A. That is what I tried to do. . . . Q. When you went back to the bank the second time, had the (defendant's) draft for $3,100 been cashed? A. Yes sir. . . . Q. And you met King in the bank at that time? A. Yes sir. Q. That was when you tried to force him to pay the Galeppi draft, tried to get him to give you the $3,100 back and demanding the bill of sale? A. Yes sir.'' The draft for $3,100 mentioned by the witness was given in payment for the cattle involved herein and other cattle purchased by the defendant from King.

Gee was examined in relation to the execution of the bill of sale as follows: ''Q. Now, this was obtained by you on the 15th day of November? A. Yes sir. Q. At about what time in the day? A. Well, it was in the afternoon. . . . It was between 2:30 and 3:30, somewhere along there. . . . Q. Now, where was this bill of sale obtained,—where was it executed? A. In our office. Q. Isn't it a fact that . . . previous to the time you obtained this bill of sale that you had been notified by the California National Bank of Sacramento that King's sight draft to Galeppi . . . had been dis-

honored? A. Yes sir. . . . Q. Isn't it a fact he told you in the bank there in the presence of Mr. Albert May, the assistant cashier, that he couldn't, under the circumstances, give you a bill of sale? A. Well, he made two or three evasive answers about it; I pinned him down to why he couldn't, and he admitted he would,—he said he would give me a bill of sale for them. Q. But, at that time, he declined to do it? A. He said he didn't have it. Q. Then . . . did he go out at that time, out to your office? A. Yes sir. Q. And execute a bill of sale out there? A. Yes sir. . . . Q. Who wrote this bill of sale? A. One of the clerks in our office. . . . It is the regular bill of sale form. Q. Do you use this bill of sale in most of the transactions for the purchase of cattle? A. Most of them."

The plaintiff's cattle were properly branded and he had complied with the provisions of the Hide and Brand Law (Stats. 1921, p. 1248) in all respects in selecting and recording his brand. The bill of sale from King and Hansen to the defendant describes the plaintiff's brand and recites: "I am the owner of said cattle."

It appears from the plaintiff's testimony that title to the cattle was not to pass until he had received payment therefor in cash. The sale is to be treated as one for cash, and King's check being dishonored, the title to the property, as between the plaintiff and King, remained in the former (*South San Francisco Pkg. etc. Co.* v. *Jacobsen*, 183 Cal. 131, 136 [290 Pac. 628]). It may be conceded, however, that King was invested with such appearances of ownership that if he had complied with the provisions of the Hide and Brand Law the plaintiff would have been estopped to assert his own title thereto. Section 6, subdivision 2, of that law provides:

"No person shall buy or sell a bovine animal, . . . unless the seller give, and the buyer receive, at the time of the delivery of such animal, . . . a written bill of sale, giving the number, kind and marks and brands of each . . . animal, signed by the party giving the same and two subscribing witnesses."

Section 10, subdivision 6, reads as follows:

"Any person violating any provision of this act shall, unless otherwise provided herein, be guilty of a misdemeanor."

■ The defendant did not take a bill of sale of the cattle at the time they were delivered on November 13th, at the time payment of the purchase price thereof was made on November 15th, or thereafter until it was discovered that King was not the owner thereof. Clearly, such violation of the statute constitutes a misdemeanor. The statute would be of little value if parties who fail to comply with its provisions were permitted to validate their purchases or sales by the subsequent execution of bills of sale. In considering a similar but less explicit statute, it was said:

"The court charged the jury that 'a failure to secure a written transfer, or bill of sale, at the actual delivery of the cattle, would be in violation of law.' Did this charge contain the correct construction of Article 779 of the Penal Code? said article reads as follows: 'Any person who shall purchase any animals or hides of cattle without obtaining a bill of sale from the owner or his agent, shall be fined,' etc. . . . Article 779, though not as explicit as it could have been made, evidently was intended to require the bill of sale to accompany the delivery of the cattle. Any other construction of the statute would defeat the purpose of the law." (*Houston* v. *State,* 13 Tex. App. 595.)

Under the circumstances of this case, the defendant's failure to secure a bill of sale at the time of payment, at the latest, constituted a misdemeanor. Section 338 of the Penal Code makes every person carrying on the business of a pawnbroker without a license guilty of a misdemeanor. Section 339 provides that every person who carries on the business of a pawnbroker, "who fails at the time of the transaction to enter in a register kept by him for that purpose, in the English language, the date, duration, amount and rate of interest of every loan made by him, or an accurate description of the property pledged, . . . or the name and residence of the pledgor, . . . or to deliver to the pledgor . . . a written copy of such entry, or to keep an account in writing of all sales made by him, is guilty of a misdemeanor." The defendant in *Levinson* v. *Boas,* 150 Cal. 185, 193 [11 Ann. Cas. 661, 12 L. R. A. (N. S.) 575, 88 Pac. 825, 828], had carried on the business of a pawnbroker without a license and had received property in pledge without complying with any of the provisions of section 339. The action was prosecuted by the receiver of an insolvent pledgor to recover

pledged property. After stating the substance of sections 338 and 339, the court said:

"It has . . . been shown that these provisions are, one and all, enacted under the police power. . . . It has further been shown that where a statute, designed for the protection of the public, prescribes a penalty, that penalty is the equivalent of an express prohibition, and that a contract in violation of its provisions is void. . . . Where the contract is void, the right of the pledgee to hold the property, which right depends upon a valid contract, is of course lost. . . . It follows, therefore, that these contracts are void, that the lien is lost, and that the judgment should be for the plaintiff." See, also, *Wallace* v. *Zinman,* 200 Cal. 585, 588 [62 A. L. R. 1341, 254 Pac. 946], and *Smith* v. *Bach,* 183 Cal. 259, 262 [191 Pac. 14]. It would be idle to speculate as to whether King would have persisted in carrying through his fraudulent scheme if the defendant had required him to execute a bill of sale before making payment for the cattle. The contract of sale by King to the defendant being void the defendant can base no right thereon.

Appellant contends that the Hide and Brand Law is invalid on the ground that it embraces more than one subject and that the subject matter of section 6, subdivision 2, is not expressed in the title. The title of the act reads:

"An act to provide for the registration of brands and earmarks, the licensing and regulating of cattle slaughterers and sellers of meat; prescribing duties of the department of agriculture in relation thereto, and penalties for the violation hereof."

Section 2 of the act provides:

"The director of agriculture is hereby authorized and it is made his duty to enforce the provisions of this act and to exercise a general supervision over and protect the cattle of this state from theft."

The subsequent sections relate to the identification of cattle by means of brands and marks, the keeping of records thereof by slaughterers of cattle, the licensing of such slaughterers, the inspection of cattle, etc., all being germane to the use of marks and brands for the purpose of protecting "the cattle of this state from theft."

"Numerous provisions having one general object fairly indicated by the title to the act may be united. . . . It is

not necessary that the title of an act should embrace an abstract of its contents." (*Los Angeles City School Dist.* v. *Odell,* 200 Cal. 637, 641 [254 Pac. 570, 572].) "It is now well settled that the constitutional provision requiring the subject of the act to be expressed in its title must be liberally construed, and that all that is required to be contained therein in order to meet the constitutional requirement is a reasonably intelligent reference to the subject to which the legislation is to be addressed. (*Estate of Wellings,* 192 Cal. 506, 519 [221 Pac. 628, 634].) "All that is required in that connection is that the subject must be in some way indicated by the title of the act, or be logically germane to it, and included within its scope." (*Buelke* v. *Levenstadt,* 190 Cal. 684, 687 [214 Pac. 42, 43]; see, also, *Regents of University of California* v. *Riley,* 199 Cal. 506, 507 [250 Pac. 182]; *Estate of Elliott,* 165 Cal. 339, 345 [132 Pac. 439]; *Matter of Application of Miller,* 162 Cal. 687, 700 [124 Pac. 427]; *Ex parte Pfirrmann,* 134 Cal. 143, 146 [66 Pac. 205]; *Treat* v. *Los Angeles Gas etc. Corp.,* 82 Cal. App. 610, 613 [256 Pac. 447]; 23 Cal. Jur. 646–653.) Under the rules stated in the foregoing decisions, it appears that the title of the act embraces but one subject, which subject is expressed in the title.

In appellant's opening brief it is said: "Section 6 of the Hide and Brand Law is also in conflict with section 25 of article IV of the Constitution. It is discriminatory in that it requires a special method of transfer for a certain kind of cattle. There is no more reason why a bill of sale should be required in the transfer of bovine cattle, than in the transfer of sheep, goats, horses, hogs or other similar personal property."

It is a matter of common knowledge that bovine cattle are more generally allowed to run at large on a range, without herders, than are other animals and that therefore they may more easily be stolen and driven away than other animals. "Cattle rustling" is a term which is well understood, one of the definitions of the word "rustler," given in the dictionaries, is "a cattle thief." The term "cattle rustling" is usually understood to apply to the stealing of bovine cattle. The discrimination referred to by the appellant appears to be justified by reason of the greater danger of theft to which bovine cattle are subject. "When a legislative classifi-

cation is attacked in the courts every presumption is in favor of its validity. . . . So long,as the classification seems based upon conditions which suggest the propriety of the different adjustments made between the classes and the adjustments proceed upon intrinsic differences and are not based upon mere arbitrary distinctions, the legislation will be upheld. The legislative determination as to what is a sufficient distinction to warrant the classification will not be overthrown unless it is palpably arbitrary.'' (5 Cal. Jur. 832.)

Appellant contends that the judgment is excessive, in that it is based on the market value of the cattle at the time of their conversion by the defendant. In this connection it is said that the plaintiff ''did not bargain or sue for and could not recover upon a *quantum meruit*.'' The action is not on contract, but for the wrongful conversion of personal property, in which the plaintiff properly alleges and demands judgment for the value of the property. (Civ. Code, sec. 3336.)

The judgment is affirmed.

Thompson (R. L.), J., and Plummer, J., concurred.